Marshall v. Reynells Co., Inc., No. S 117-3-01 Wncv (Teachout, J., Mar. 18, 2003)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

**STATE OF VERMONT**
**WASHINGTON COUNTY, SS.**

| | | |
|---|---|---|
| **DENNIS MARSHALL** | ) | |
| | ) | |
| **v.** | ) | **Washington Superior Court** |
| | ) | **Docket No. S 117-3-01Wncv** |
| | ) | |
| **REYNELLS CO., INC. and** | ) | |
| **MAC REYNELLS** | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter came before the court for a hearing on the merits on February 19, 20, and 21, 2003. Plaintiff Dennis Marshall is represented by Eric G. Parker, Esq. Defendants Reynells Co., Inc. and Mac Reynells are represented by Thomas P. Simon, Esq. Based on the evidence admitted and after consideration of the arguments of counsel, the court makes the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

The court finds the following facts by a preponderance of the evidence.

On January 16, 1999, a Saturday, Dennis Marshall was at his commercial garage property in Duxbury cleaning out a drain in preparation for completing an imminent sale of the property to Charles O'Brien for $50,000 pursuant to written contract. The property was uninsured. He had stopped using the garage for purposes of his excavation business a few years before, and had used it little since. The sale would be able to be closed as soon as this one last requirement was met and related documents completed.

In anticipation of the sale, he had given Charles O'Brien permission to start using the garage several days or weeks before, and Charles O'Brien had started to use it. O'Brien had arranged with Grenier Gas to switch the heating account into his own name. Grenier Gas had made a service visit to the garage on December 29, 1998, done a routine maintenance check on

1

the gas heater, found it to be intact and in working order, fired it up, delivered gas, and opened a service account in O'Brien's name.  Grenier gas had installed the heater in 1989 for Dennis Marshall, and had serviced it routinely since.  There had been no problems with this heater, or with this type of heater in other installations.  During Marshall's ownership, Marshall had made several improvements to the garage, including rewiring the structure to Code.  There were no known problems with either the heating or electrical systems.

The property consisted of a two-bay vehicle garage with a workbench along the back wall and an overhead door at the front.  A small office was attached to the front of the building on the left side. An outside door led into the office, and another door led from the office into the front left area of the garage.  The building was insulated and the walls and ceiling were covered with homosote, creating a vacant attic space above the ceiling and under the roof.  The roof structure consisted of asphalt shingles over plywood sheathing covering gabled trusses.  The heat source for the building was the Reznor LP gas heater installed by Grenier Gas.  It was located toward the back of the garage a little to the right of center.  Gas tanks and the regulator were outside the garage, and copper pipe led from the regulator, which was outside, through the back wall to a leg pipe to the gas valve and then to the back of the heater unit.  The heater was held in place by an assembly consisting of 4 bolts that were fastened to the top of the rectangular heater unit at their bottom ends and to two 2"x 8"s at their top ends.  The 2" x 8"s lay across the roof trusses, so that the heater hung suspended below the ceiling.  The heater protruded into the space in the right bay a distance of 52 3/4", more or less, from the back wall.  The top of the suspended heater was 19" below the ceiling, and the bottom was 5 feet below the ceiling, leaving a distance of 8 feet from the bottom of the heater to the floor.  Because of this limited amount of clearance, when Dennis Marshall had used the garage, he had put large trucks in the left bay rather than the right, so as not to bump the heater.

When Dennis Marshall left the garage on Saturday afternoon, January 16th, he left the thermostat set low, for unoccupied use, at approximately 40-45 degrees.

As of January 16, 1999, Charles O'Brien's son Peter had given Mac Reynells, who worked with his father in his father's business, permission to park the Reynells' 12 ton Freightliner in the garage on occasion, and Mac had done so 3-4 times.  He had backed the truck in to the right bay with the assistance of his father and others, who guided the procedure so that the truck would fit in the space and not hit the heater.  Whenever Mac backed into the garage, the heater was located behind the truck in a location that was not visible from the rear view mirrors on the truck.  There was sufficient room to back the truck in and stop short of the heater, and still close the overhead door in the front, but it had to be done carefully.

On the afternoon of Sunday, January 19th, Mac Reynells brought the Freightliner to the property and parked it outside, where he pressure washed it.  He was alone.  He then backed the truck into the right bay to park it in the garage overnight, expecting to use it early in the morning.  After backing it in, he stayed and did some additional maintenance work on it for approximately half an hour.  He left the garage at approximately 5:30 p.m.

Mac Reynells testified that he did not back the truck into the heater, but only backed it in far enough to clear the overhead front door by enough distance to walk in front of the truck, and that he knew how far to back it in from his prior guided experiences. There was considerable testimony and controversy at trial on this issue. The court finds that Mac Reynells' testimony on this point, while quite likely his sincerely held belief, is not credible, as it conflicts with concrete evidence of where the truck was parked at the time of the fire, as well as other evidence. The credible evidence shows that he backed the truck far enough into the right bay that it gently pushed the heater unit backwards a distance that is unknown with precision, but was far enough to disturb the proper functioning of the 10' flue pipe that carried exhaust gases from the heater up through the ceiling and attic space and out the roof. The evidence that the court finds reliable includes:

–photographs 1.2, 1.4 and 1.5 which show considerably more than one foot between the front of the parked truck and the front of the garage, showing the truck was parked much further back than Mac Reynells testified;
–evidence that two persons had walked in front of the parked truck shoulder to shoulder after it was parked, showing the truck was parked much further back than Reynells testified;     –photograph 1. top of the truck was less than 48", more or less, from the back wall (this is not inconsistent with the diagonal measurement of the heater at 42");
–testimony and drawings showing that the distance between the front of the heater and the back wall, when the heater was in proper position, was 52 3/4", which was more than the distance between the back of the *parked* truck at heater height and the back wall, showing that the truck was parked far enough back that it pushed the heater back;
–a reasonable factual basis and explanation linking such conduct with a fire in the roof area of the garage approximately twelve hours later, and
–lack of evidence of any other plausible explanation for the fire, even after an investigation of the fire scene by the head of the Vermont State Police Fire Investigation Unit, and subsequent expert analysis of the evidence.

It is reasonably foreseeable that driving a 12 ton Freightliner into a working heater could disrupt the functioning of the heater and exhaust system in a manner that would create a fire hazard. It is almost certain that if the truck pushed the heater a number of inches backward, Mac Reynells would not have seen, heard, or felt it because of the respective locations of the heater and truck mirrors, the heavy weight of the truck compared to the heater, and the noise of the truck when coming to a stop. It is also not surprising that the heater itself would not be dented, as it is made primarily of heavy metal, and the truck speed would have been slow. The court does not find relevant the testimony that a hard jolt would have been needed to knock the regulator off the rear wall of the garage, because inspection of the flange provides strong evidence that the flange was not fastened onto the wall with screws, so the regulator could easily have been pushed back away from the wall without any resistance due to the presence of screws. Moreover, no screws were ever found.

The temperature during the night between Sunday night and Monday morning dropped to around 30 degrees, creating a need for the heater to cycle on throughout the night, over a period of twelve hours, in order to maintain a temperature in the interior of the garage of 40-45 degrees.

When the heater was pushed back, the flue pipes leading from the heater through the ceiling and attic and out the roof became at least partially uncoupled, either where the first 5' section connected to the top of the heater (19" below the homosote ceiling), or where the two 5' sections joined in the attic, approximately 2 feet below the roofline, or both. Ten minutes of operation of the heater produced exhaust gases with a temperature of 450 degrees at the point of exiting the heater itself, and 300 degrees five feet higher, where the two sections were supposed to be coupled, within the attic area. The heater cycled on and off throughout the night, resulting in exhaust gases escaping into the attic area, and perhaps also above the heater, below the ceiling, over a period of twelve hours, thereby raising the temperature of the material in the roof area. The credible evidence supporting this conclusion includes:

–evidence that the method of connecting the flue pipe sections, and connecting the flue pipe to the top of the heater, was to snap them in place with force, meaning that force could also cause them to snap out of position;

–the logical conclusion that if the heater was pushed back, force would be exerted on the joints where the heater connected to the lower flue pipe and where the two flue pipes were connected together, reasonably causing some opening to occur at one or both locations, out of which exhaust gases would have the opportunity to escape, most likely at the connection of the two pieces of flue pipe in the attic, rather than below the ceiling, since none of the three persons who arrived at 5:00 a.m. noticed the smell of gases;

–testimony concerning the temperature of exhaust gases as they leave the heater and five feet higher;

–credible testimony that the temperature of the exhaust gases would have been high enough to raise the temperature of combustible material in the roof structures and ceiling over a twelve hour period to a point high enough to ignite: 375 degrees for 30 minutes would have been sufficient to ignite wood;

–physical and photographic evidence that the bottom flue pipe was in an angled position (not in a proper vertical position) during the time it was exposed to severe heat from the fire;

–evidence of a small dent in the bottom section of flue pipe at the approximate height at which it would have passed through the ceiling, showing that it was touching something, consistent with the circumstance that clearances between the flue pipe and combustible material were compromised; and

–credible and consistent evidence from different sources that from an early point, the fire was burning high in the garage: evidence from firefighter Grace that upon arrival only a few minutes after the call, the fire was burning high in the roof area; the lack of early witness testimony of smoke coming out the building at low levels; Reynells' January 18th statement to Det. Sgt. Harrington that he had seen the chimney glowing (indicating the inner wall had already burned away) but encountered only smoke when he opened the office door at ground floor level; burn patterns on the walls showing uniform high burning; the complete collapse of the roof shortly after the firefighters arrived; and other burn pattern evidence on the truck showing higher heat and greater burning at the top part of the truck than at the bottom.

The court does not find credible the suggested inferences that both connections of the flue pipes (at the heater and five feet up) would have remained intact if the heater was pushed back,

or that even if there were openings, no exhaust gases would have escaped, or that the attic was sufficiently cold and spacious to provide for the complete dissipation of all exhaust gases with no rise in temperature of the material in the roof and ceiling. The court does not find credible the suggested inference that the fire originated in the lower part of the right rear corner. While there is evidence of considerable burning in the lower right rear corner of the garage, that circumstance is consistent with the fire having started high and having generated a secondary fire in the right rear corner after the roof collapsed, which secondary fire was made worse by reradiation and the inability of the firefighters to reach that area with their hoses. Such evidence does not compel the conclusion that the origin of the fire was low in the right rear corner as opposed to high in the roof area, particularly as there is no evidence of either ignition or combustible material in the right rear corner (the garage had been cleaned up in preparation for the sale), whereas there is considerable evidence of high burning in the roof area as well as a reasonable explanation. Therefore, the court finds that the origin of the fire was high in the roof portion of the garage.

At 5:00 a.m. on Monday morning, January 18, 1999, Pete O'Brien, Dale Marshall, and Luke Doloff stopped at the garage on their way to do snow removal and other maintenance work. They needed gas and the gas station was not yet open, so they parked outside and went in to fetch a can of spare gas and some buckets of salt to take with them. It was dark, so they turned on the lights to see. The O'Briens' half-ton pickup truck with sander was parked in the left bay, and the Reynells' Freightliner was parked in the right bay. At one point two of them walked shoulder to shoulder in front of the Freightliner. They did not smoke. They did not see or smell anything unusual, and they did not hear the heater come on. They were in a hurry, and got the gas can from the rear of the left bay, and left.

By 6:10-6:15 a.m., smoke was coming out of the garage around the eaves as seen by Kevin Wells, a neighbor who saw the smoke and called the fire department. At about the same time, Mac Reynells arrived at the garage to get the Freightliner and go to work. As he approached in the dark, he saw smoke and the chimney glowing red but no flames. He attempted to enter the garage through the office door with the intent of getting the truck out, and encountered too much smoke to proceed. He also called the fire department. Firefighters arrived within five minutes. He returned to the garage. Smoke was visible escaping around the roof portions of the garage, and flames were coming through the roof. The entire roof, except for a small part attached to the front gable, collapsed shortly after the firefighters arrived. It took 1-1/2 hours to put the fire out. State police Det. Sgt. Harrington, who then headed the Fire Investigation Unit, was called to the scene. He took photographs and investigated for 2 to 2 ½ hours. He did not find a basis for conducting a further arson investigation, ordered the removal of the trucks and other changes at the scene, and left. He wrote a report in which he concluded that the origin of the fire was in the right rear corner of the structure, and noted that there was a suspended gas heater located at this corner, but concluded that it was not known if this caused the fire. His final conclusion was that the cause of the fire was undetermined. After leaving the scene and before writing his report, he was contacted once by Mr. Marshall with a proposed theory, which he did not find consistent with his conclusions from his criminal investigation. Other fire investigators have subsequently spent considerable time analyzing his photographs, along with other available information, for purposes of this civil action.

5

The garage and both trucks were destroyed in the fire. Mr. Marshall lost the sale of the garage for $50,000, as the buyer wanted the property for the garage and not for the lot. Under the terms of the proposed sale, Mr. Marshall was to receive $10,000 at closing, and a note for $40,000 at 7.5% interest, with a balloon payment in three years. Mr. Marshall claims he spent $6,000 in cleanup costs, but he did not produce either any receipts or any more than generalized figures in support of this claim. He later sold the property as an unimproved lot, after doing some work to raise it out of the flood plain and obtain necessary permits. He sold it on May 16, 2001 for $16,000, plus he was reimbursed $23,650 by the buyer for "cleanup costs" to prepare the lot for sale. Because he was reimbursed for those costs, he has not proved that they constitute any portion of his loss. He has not proved that they represent different costs than the $6,000 he otherwise claims in cleanup costs. He seeks compensation for various litigation expenses, including costs of an expert fire investigator, and discovery and mediation costs. The court finds that the damages proved include:

–interest on $10,000 at legal rate ( 2/1/99 original sale date to 5/16/01 actual sale date);
–interest on $40,000 at the contract rate of 7.5% from 2/1/99 to the sale on 5/16/01; and
–$34,000, plus legal interest from 5/16/01, the actual sale date to the trial date.

Cleanup costs have not been proved, both because they are not supported with sufficient proof, and because they have not been proved to have been paid separate and apart from the amount for which reimbursement was received. Litigation costs are not recoverable in a negligence action.

## Conclusions

Plaintiff Dennis Marshall has proved the elements of negligence against Mac Reynells as follows:

1. Duty. Mac Reynells had a duty to use ordinary care in his conduct at the Marshall property so as to avoid foreseeable harm to Mr. Marshall's property.

2. Breach. Mr. Reynells breached that duty when he backed the Freightliner so far back into the right bay that the truck pushed the heater back. It was reasonably foreseeable that driving the truck into the heater would cause it to malfunction in a manner that would create a fire hazard.

3. Causation. Backing the truck into the heater caused the exhaust system to malfunction, sending exhaust gases into the attic area of the garage, producing temperatures that resulted in a fire that started in the roof area of the garage and destroyed the whole garage, despite the immediate response of the firefighters.

4. Damages. Mr. Marshall has proved damages in the amount of lost property value ($34,000) plus interest lost from not having sold the property for $50,000 in February of 1999, to be calculated as described above.

6

## Order

Plaintiff's attorney shall prepare a proposed judgment order.  Defendant's attorney shall have five days to object to the proposed order.

Dated at Montpelier this ____ of March, 2003.


Mary Miles Teachout
Superior Judge